UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br><br>    v.<br><br>THIRD POINT OFFSHORE FUND, LTD.,<br><br>THIRD POINT ULTRA, LTD.,<br><br>THIRD POINT PARTNERS QUALIFIED L.P.,<br><br>and<br><br>THIRD POINT, LLC,<br><br>                      Defendants. | Civil Action No. 1:15-cv-01366-KBJ |

# MOTION AND MEMORANDUM OF THE UNITED STATES IN SUPPORT OF ENTRY OF FINAL JUDGMENT

Pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) ("APPA"), plaintiff United States of America ("United States") moves for entry of the proposed Final Judgment filed on August 24, 2015 (Document 2-1).  The proposed Final Judgment may be entered at this time without further proceedings if the Court determines that entry is in the public interest.  15 U.S.C. § 16(e).  The Competitive Impact Statement ("CIS") filed by the United States on August 24, 2015 (Document 3), explains why entry of the proposed Final Judgment is in the public interest.  The United States is filing simultaneously with this Motion and Memorandum a Certificate of Compliance (attached as Exhibit 1) setting forth the steps taken by the parties to comply with the applicable provisions of the APPA and certifying that the sixty-day statutory public comment period has expired.

## I. BACKGROUND

On August 24, 2015, the United States filed a Complaint against Third Point Offshore Fund, Ltd. ("Offshore"), Third Point Ultra, Ltd. ("Ultra"), Third Point Partners Qualified L.P. ("Qualified") (collectively, "the Defendant Funds"), and Third Point LLC (together with the Defendant Funds collectively, "Defendants") related to the Defendant Funds' acquisitions of voting securities of Yahoo! Inc. ("Yahoo") in 2011.

The Complaint alleges that the Defendant Funds violated Section 7A of the Clayton Act, 15 U.S.C. § 18a, commonly known as the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"). The HSR Act requires certain acquiring and acquired parties to file pre-acquisition Notification and Report Forms with the Department of Justice and the Federal Trade Commission (collectively, the "federal antitrust agencies" or "agencies") and to observe a statutorily mandated waiting period before consummating their acquisition.[1] A fundamental purpose of the notification and waiting period is to allow the agencies an opportunity to conduct an antitrust review of proposed transactions that meet the HSR Act's jurisdictional thresholds before they are consummated.

Compliance with the HSR Act is critical to the federal antitrust agencies' ability to investigate large acquisitions before they are consummated, prevent acquisitions determined to be unlawful under Section 7 of the Clayton Act (15 U.S.C. §18), and design effective divestiture relief when appropriate. Before Congress enacted the HSR Act, the federal antitrust agencies often were forced to investigate anticompetitive acquisitions that had already been consummated

---

[1] The HSR Act requires that "no person shall acquire, directly or indirectly, any voting securities of any person" exceeding certain thresholds until both have made premerger notification filings and the post-filing waiting period has expired. 15 U.S.C. § 18a(a). The post-filing waiting period is either 30 days after filing or, if the relevant federal antitrust agency requests additional information, 30 days after the parties comply with the agency's request. 15 U.S.C. § 18a(b). The agencies may grant early termination of the waiting period, 15 U.S.C. § 18a(b)(2), and often do so when an acquisition poses no competitive problems.

without public notice.  In those situations, the agencies' only recourse was to sue to unwind the parties' merger.  The combined entity usually had the incentive to delay litigation, and years often passed before the case was adjudicated and relief was pursued or obtained.  During this extended time, consumers were harmed by the reduction in competition between the merging parties and, even after the court's adjudication, effective relief was often impossible to achieve.  Congress enacted the HSR Act to address these problems and to strengthen and improve antitrust enforcement by giving the agencies an opportunity to investigate certain large acquisitions before they are consummated.

As alleged in the Complaint, the Defendant Funds each acquired voting securities of Yahoo in excess of the $66 million statutory threshold then in effect without complying with the pre-merger notification and waiting period requirements of the HSR Act.  Defendants' failure to comply undermined the statutory scheme and the purpose of the HSR Act by precluding the agencies' timely review of the Defendants' acquisitions.

The Complaint further alleges that the Defendant Funds could not rely on the HSR Act's exemption for acquisitions made solely for the purpose of investment ("investment-only exemption") because they could not show they had "no intention of participating in the formulation, determination, or direction of the basic business decisions of the issuer," as the exemption is defined in the rules promulgated under the HSR Act.  *See* 16. C.F.R. § 801.1(i)(1). The Complaint alleges that the Defendants and/or their agents engaged in a number of acts that showed an intent inconsistent with the exemption.  Namely, the Defendants and/or their agents contacted certain individuals to gauge their interest and willingness to become the CEO of Yahoo or a potential board candidate of Yahoo; took other steps to assemble an alternate slate of board of directors for Yahoo; drafted correspondence to Yahoo to announce that Third Point

LLC was prepared to join the board of Yahoo (*i.e.*, propose Third Point people as candidates for the board of Yahoo); internally deliberated the possible launch of a proxy battle for directors of Yahoo; and made public statements that they were prepared to propose a slate of directors at Yahoo's next annual meeting.  The Complaint seeks an adjudication that the Defendant Funds' acquisitions of voting securities of Yahoo violated the HSR Act, and asks the Court to issue an appropriate injunction.

At the same time the Complaint was filed, the United States also filed a Stipulation and Order, proposed Final Judgment, and CIS.  The terms of the proposed Final Judgment are designed to prevent and restrain Defendants' future HSR Act violations by, among other things, prohibiting Defendants from acquiring voting securities without observing the HSR Act's notification and waiting period requirements in reliance on the investment-only exemption if they have engaged in certain specified acts during the four (4) months prior to an acquisition that is otherwise reportable under the Act, unless they have affirmatively stated that they are not pursuing board or management representation with respect to the issuer of those voting securities.  The proposed Final Judgment also sets forth required compliance procedures directed towards ensuring Defendants' compliance with the limitations imposed by the proposed Final Judgment.  Lastly, the proposed Final Judgment requires Defendants to file an annual statement with the United States detailing the manner of their compliance with the Final Judgment, including a list of all acquisitions in which they have relied on the investment-only exemption.

The Stipulation and Order provides that the proposed Final Judgment may be entered by the Court after the completion of the procedures required by the APPA.  Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the Final Judgment and to punish violations

thereof.

## II.     COMPLIANCE WITH THE APPA

The APPA requires a sixty-day period for the submission of written comments relating to the proposed Final Judgment, 15 U.S.C. § 16(b).  In compliance with the APPA, the United States filed the CIS with the Court on August 24, 2015, and published the proposed Final Judgment and CIS in the *Federal Register* on August 31, 2015, *see* 80 Fed. Reg. 52500-02 (2015).  Summaries of the terms of the proposed Final Judgment and CIS, together with directions for the submission of written comments relating to the proposed Final Judgment, were published in *The Washington Post* for several days during the period August 28, 2015, through September 3, 2015.  The sixty-day period for public comments ended on October 30, 2015.  The United States received no written comments relating to the proposed Final Judgment.

The Certificate of Compliance filed with this Motion and Memorandum states that all the requirements of the APPA have been satisfied.  It is now appropriate for the Court to make the public interest determination required by 15 U.S.C. § 16(e) and to enter the Proposed Final Judgment.

## III.    STANDARD OF JUDICIAL REVIEW

Before entering the proposed Final Judgment, the APPA requires the Court to determine whether the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1).  In making that determination, the Court shall consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A)-(B).  In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest."  *United States v. Microsoft Corp.,* 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.,* 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. InBev N.V./S.A.,* 2009-2 Trade Cas. (CCH) ¶76,736, 2009 U.S. Dist. LEXIS 84787, No. 08-1965 (JR), at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable").

As the United States Court of Appeals for the District of Columbia has held, under the APPA, a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties.  *See Microsoft,* 56 F.3d at 1458-62.  With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public."  *United States v. BNS, Inc.,* 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.,* 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.,* 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev,* 2009 U.S. Dist. LEXIS 84787, at *3.  Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust

>consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest.*" More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2] In determining whether a proposed settlement is in the public interest, the court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns,* 489 F. Supp. 2d at 17; *see also Microsoft,* 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.,* 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States's "prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case"); *United States v. Republic Servs., Inc.,* 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (finding that "[i]n light of the deferential review to which the government's proposed remedy is accorded, [an] argument that an alternative remedy may be comparably superior, even if true, is not sufficient basis for finding that the proposed final judgment is not in the public interest").

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long

---

[2] *Cf. BNS,* 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.,* 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Te. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). Therefore, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *Republic Servs.*, 723 F. Supp. 2d at 158 (entering final judgment "[b]ecause there is an adequate factual foundation upon which to conclude that the government's proposed divestitures will remedy the antitrust violations alleged in the complaint").

Moreover, in its 2004 amendments to the Tunney Act,[3] Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, stating: "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply

---

[3] The 2004 amendments substituted the word "shall" for "may" when directing the courts to consider the enumerated factors and amended the list of factors to focus on competitive considerations and address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[4]

The United States alleged in its Complaint that the Defendant Funds each acquired in excess of $66 million in voting securities of Yahoo without complying with the pre-merger notification and waiting period requirements of the HSR Act.  The Complaint further alleges that the Defendant Funds could not rely on the HSR Act's investment-only exemption because, at the time of the acquisitions, they were engaging in activities that evidenced an intent inconsistent with the exemption.  The remedy in the proposed Final Judgment contains injunctive relief designed to prevent future violations of the HSR Act by setting forth specific prohibited conduct, requires that the Defendants maintain an HSR compliance program, and provides access and inspection procedures to enable the United States to determine and ensure compliance with the proposed Final Judgment.

The public has had the opportunity to comment on the proposed Final Judgment as required by law, and no comments have been submitted.  There has been no showing that the proposed settlement constitutes an abuse of the United States's discretion or that it is not within the zone of settlements consistent with the public interest.

## IV.      CONCLUSION

For the reasons set forth in this Motion and Memorandum and the CIS, the Court should find that the proposed Final Judgment is in the public interest and should enter the proposed

---

[4] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

Final Judgment without further proceedings. The United States respectfully requests that the proposed Final Judgment, attached hereto as Exhibit 2, be entered at this time.

Dated:  December 4, 2015                                             Respectfully Submitted,


                                                            /s/ Kenneth A. Libby
                                                Kenneth A. Libby
                                                Special Attorney